**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JULIUS O. WHITESIDE**,

     **Petitioner,**                            **Case No. 2:10-cv-816**

     v.

**WARDEN, SOUTHERN OHIO**          **JUDGE GREGORY L. FROST**
**CORRECTIONAL FACILITY,**           **Magistrate Judge Kemp**

     **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, Julius O. Whiteside, a prisoner at the Southern Ohio Correctional Facility located in Lucasville, Ohio, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. The case is now before the Court on the petition, the return of writ, petitioner's traverse, and the exhibits of the parties. For the following reasons, it will be recommended that the petition be denied.

## I. PROCEDURAL HISTORY

On December 14, 2005, petitioner was indicted in Franklin County, Ohio on charges of aggravated murder with a firearm specification and having a weapon while under a disability. He was accused of killing one Jaron Armstrong. His case was tried twice to a jury; both times, the jury was unable to reach a verdict. However, the weapons charge, which was tried to the court during the second trial, resulted in petitioner's being convicted of that charge. He was then sentenced to a five-year prison term.

Petitioner appealed his conviction and sentence on the weapons charge to the Tenth

District Court of Appeals. He raised, on appeal, these claims: (1) that his conviction was against the manifest weight of the evidence and that he was convicted in violation of the Due Process clause of the Fourteenth Amendment; (2) that when the trial court imposed the maximum sentence, it did so in violation of the Sixth Amendment and the Ex Post Facto clause; and (3) that his counsel was ineffective for failing to object to the sentence as having been imposed in violation of the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005) and *Blakely v. Washington*, 542 U.S. 296 (2004). The court of appeals overruled his assignments of error in an opinion dated August 5, 2008. Acting *pro se*, petitioner filed a motion to reopen his appeal pursuant to Ohio Appellate Rule 26(B), seeking to raise two additional issues - that law enforcement officials improperly threatened a defense witness, and that his counsel rendered ineffective assistance by abandoning certain lines of investigation, defenses, and trial strategies. That motion was denied on December 30, 2008. *Return of Writ*, Exhibit 30. Petitioner also sought review in the Ohio Supreme Court, but was unsuccessful. That court denied his motion for leave to file a delayed appeal on June 3, 2009. *Return of Writ*, Exhibit 36.

While the appeal on the weapons charge was pending, petitioner was scheduled to go to trial for the third time on the aggravated murder charge. He moved to dismiss the case on due process and double jeopardy grounds, but the trial court overruled that motion and, on May 5, 2008, the case proceeded to trial. On May 15, 2008, the jury returned a verdict of guilty to a charge of voluntary manslaughter. The trial court subsequently sentenced petitioner to a thirteen-year term of imprisonment (ten on the manslaughter

charge and a three-year consecutive sentence on the firearm specification), but ran the sentence concurrent with the five-year sentence imposed on the prior conviction for having a weapon under a disability. *Return of Writ*, Exhibit 15.

Petitioner also appealed this conviction to the Tenth District Court of Appeals. He raised nine assignments of error on appeal, as follows:

ASSIGNMENT OF ERROR # 1

PRIOR TO THE THIRD TRIAL AND AFTER TWO HUNG JURY MISTRIALS, THE COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO DISMISS IN VIOLATION OF THE DOUBLE JEOPARDY AND DUE PROCESS CLAUSES OF FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE OHIO CONSTITUTION, AND THE OHIO RULES OF CRIMINAL PROCEDURE.

ASSIGNMENT OF ERROR # 2

APPELLANT'S CONVICTION FOR MANSLAUGHTER WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 & 16 OF THE OHIO CONSTITUTION AND THE MANSLAUGHTER CONVICTION WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

ASSIGNMENT OF ERROR # 3

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S RULE 29 MOTION IN ALL THREE TRIALS.

ASSIGNMENT OF ERROR # 4

APPELLANT'S MAXIMUM SENTENCE FOR MANSLAUGHTER VIOLATED THE PROVISION AGAINST EX POST FACTO LAWS AND HIS DUE PROCESS RIGHTS CONTAINED IN THE OHIO AND U.S. CONSTITUTIONS.

ASSIGNMENT OF ERROR # 5

THE TRIAL COURT ERRED WHEN IT PROHIBITED RONNIE BLAND FROM

TESTIFYING AND ASSERTING HIS FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION BEFORE THE JURY, IN VIOLATION OF THE COMPULSORY PROCESS AND DUE PROCESS CLAUSES OF THE U.S. & OHIO CONSTITUTIONS AND COLUMBUS V. COOPER.

ASSIGNMENT OF ERROR # 6

THE TRIAL COURT ERRED WHEN IT PROHIBITED ERIKA LEWIS FROM TESTIFYING AND ASSERTING HER FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION BEFORE THE JURY, IN VIOLATION OF THE CONFRONTATION CLAUSE AND DUE PROCESS CLAUSES OF THE OHIO AND U.S. CONSTITUTIONS AND OHIO EVIDENCE RULE 608(B).

ASSIGNMENT OF ERROR # 7

THE TRIAL COURT ERRED BY NOT ALLOWING THE INTRODUCTION OF RONALD BLAND'S INTERVIEW OR AT LEAST BY NOT PERMITTING TRIAL COUNSEL TO QUESTION THE POLICE ABOUT THE SUBSTANCE OF THEIR INTERVIEW WITH RONALD BLAND IN VIOLATION OF THE HEARSAY EXCEPTIONS CONTAINED IN THE OHIO RULES OF EVIDENCE AND THE FEDERAL AND OHIO CONSTITUTIONAL PROTECTIONS OF DUE PROCESS OF LAW, FUNDAMENTAL FAIRNESS, COMPULSORY PROCESS, CONFRONTATION, EQUAL PROTECTION, AND THE RIGHT TO PRESENT A COMPLETE DEFENSE.

ASSIGNMENT OF ERROR # 8

PROSECUTORIAL AND POLICE MISCONDUCT IN THE FORM OF THE WITNESS INTIMIDATION OF RONNIE BLAND, A DEFENSE WITNESS, VIOLATED THE APPELLANT'S RIGHT TO A FAIR TRIAL, COMPULSORY PROCESS, SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION UNDER THE FEDERAL AND OHIO CONSTITUTIONS.

*4 ASSIGNMENT OF ERROR # 9

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

Subsequently, he supplemented his appeal with a tenth assignment of error:

ASSIGNMENT OF ERROR # 10

4

PROSECUTORIAL MISCONDUCT CONSISTING OF IMPROPER AND PREJUDICIAL COMMENTS BY THE PROSECUTOR IN ITS REBUTTAL CLOSING STATEMENT VIOLATED THE APPELLANT'S RIGHT TO A FAIR TRIAL, DUE PROCESS AND EQUAL PROTECTION UNDER THE FEDERAL AND OHIO CONSTITUTIONS AND TRIAL COUNSEL FAILURE'S [sic] TO OBJECT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

In an opinion issued on April 23, 2009, the court of appeals overruled all ten assignments of error and affirmed his conviction and sentence. *State v. Whiteside*, 2009 WL 1099435 (Franklin Co. App. April 23, 2009). Petitioner further appealed his conviction to the Ohio Supreme Court, which declined review. *State v. Whiteside*, 122 Ohio St. 3d 1505 (2009).

While his appeal was pending, petitioner, acting *pro se*, filed a petition for post-conviction relief pursuant to Ohio Revised Code §2953.21. The trial court overruled that petition in a decision dated August 25, 2010, holding that all of the claims in the petition were barred by the doctrine of *res judicata*. *Return of Writ*, Exhibit 33. It does not appear from the record that petitioner appealed that decision.

## II. THE FACTS

The facts of this case were summarized by the state court of appeals, in its Opinion of April 23, 2009, as follows. As noted below, this Court must accept those facts as accurate for purposes of this proceeding.

The charges herein arise out of the shooting death of Jaron Armstrong ("Armstrong"), that occurred on September 15, 2005, at approximately 1:00 a.m. During the trial, the jury heard testimony from 17 witnesses and the following factual scenario is taken from the same.

Early in the day of September 14, 2005, Erika Lewis ("Lewis"), who had ended a relationship with Armstrong, was walking down the street in the area of the Franklin County Courthouse with her friend, Donee Peterson ("Peterson"), and Peterson's son. Appellant called out to Lewis that she would "look cute in some Apple Bottom jeans." (Tr. 509.) Appellant, who was with two other men, introduced himself as "Nut." Appellant and Lewis exchanged "chirp" and cell phone numbers. Peterson and Lewis then proceeded to a job fair at Nationwide Arena and afterwards went to a Wendy's restaurant. Appellant "chirped" Lewis and later gave Lewis and Peterson a ride in his pickup truck to Lewis's apartment at the Nelson Park Apartments at 1964 Maryland Avenue, in Columbus, Ohio.

Appellant returned to Lewis's apartment later that day and took her to a McDonald's restaurant. Appellant left again, but Lewis later "chirped" appellant to see if he could get some marijuana for her. Appellant agreed to, and they met at a house off of Fifth Avenue. After obtaining some marijuana and smoking some at the house off Fifth Avenue, Lewis returned home. Lewis was preparing for bed when appellant "chirped" and asked her if she wanted some company. Lewis allowed appellant to come over, and once inside, appellant told Lewis his cousin and uncle were also outside. Appellant asked Lewis if they could come in as well, and Lewis allowed them into her apartment. Lewis testified that appellant was driving the same truck as he had earlier that day.

Once appellant and the two other men were inside the apartment, Wonquet Reeves ("Reeves"), and Synneatra Lovett ("Lovett"), who were residents of the apartment complex, came over to Lewis's apartment. According to the women, on his lap, appellant had a gun, described as a revolver, that he later placed in his back pocket. While appellant and the three women were in Lewis's kitchen, Armstrong rode by on a bicycle and said something that they were not able to hear. Armstrong rode by again and this time said something to the effect of coming back and shooting up Lewis's apartment. Lewis told appellant to disregard Armstrong's comments, but appellant went into the living room, said something to the other two men, and then all three went outside. Lewis called them back into the apartment, but then the men exited the back door. While the men appeared to be leaving, appellant walked the other way as Armstrong was then approaching.

Appellant and Armstrong talked for a few minutes and though no one appeared to be yelling, appellant kept his hand in his back pocket where the gun was. The two men separated, and Armstrong walked in the direction of his sister's apartment at 1986 Maryland Avenue. Appellant walked toward the truck where his cousin, who had moved the truck out of the parking spot, was sitting in the driver's seat.

Moments later, several gunshots were heard, and the three women ran outside and

saw appellant, with a gun in his hand, running out of a "cut between" the buildings from the area where the shots were fired. Lewis told appellant, "you got to be F'd up; I'm calling the police." (Tr. 563.) Lewis called 911 and heard the truck speed off, squealing its tires in the process. Lewis found Armstrong at the door of his sister's apartment, where he eventually died on the porch.

According to Lakeisha Irvin ("Irvin"), Armstrong's sister, she heard several gunshots and, a few moments later, opened her door to find her brother. Peterson, who was on her own porch at the time, heard gunshots and saw appellant's truck speed off quickly.

The police arrived shortly thereafter. Columbus Police Officer Kevin Eckenrode was the first officer to respond to the call dispatched on September 15, 2005, at 1:03 a.m., of shots fired. Columbus Police Officer Kevin Yankovich was the second officer to arrive, and a female at the scene told him that he needed to "talk to Erika." (Tr. 265.) Less than a minute later, Lewis identified herself to Officer Yankovich and went to his cruiser for questioning. Lewis told Officer Yankovich of the house off Fifth Avenue where the marijuana was purchased, and they drove to that location so that Lewis could point out the exact house to the police. Lewis also told Officer Yankovich "Nut" was responsible for the shooting and that she did not know his real name.

After returning to the scene, Lewis talked to homicide detectives that had arrived. Thereafter, Lewis gathered a few belongings and went to stay at another apartment. The next day, Lewis and Reeves identified appellant out of a photo array. An arrest warrant was issued for appellant on September 16, 2005, and he was eventually apprehended in Georgia.

*State v. Whiteside*, 2009 WL 1099435, *1-*2.

### III. PETITIONER'S HABEAS CLAIMS

Petitioner filed his habeas corpus petition in this Court on September 30, 2010. In

his petition, he raised the following twelve claims:

**Ground One**: The trial court erred when it denied Petitioner's motion to dismiss in violation of the double jeopardy and due process clauses of the U.S. and Ohio Constitutions and the Ohio Rules of Criminal Practice.

**Ground Two**: Petitioner's conviction for manslaughter was not supported by the sufficiency of the evidence in violation of the U.S. and Ohio due process

clause and was also against the manifest weight of the evidence.

**Ground Three**: Petitioner's maximum sentence for manslaughter violated the provision against ex post facto laws and his due process rights contained in the U.S. and Ohio Constitutions.

**Ground Four**: The trial court erred when it prohibited Ronnie Bland from testifying and asserting his rights against self-incrimination before the jury, in violation of the compulsory process and due process clauses of the U.S. and Ohio Constitutions.

**Ground Five**: The trial court erred when it prohibited Erika Lewis from testifying and asserting her Fifth Amendment rights against self-incrimination before the jury, in violation of the confrontation clause and due process clause of the U.S. and Ohio Constitutions and Ohio Evidence Rule 608(A).

**Ground Six**: The trial court erred by not allowing the introduction of Ronnie Bland's interview or at least by not permitting trial counsel to question the police about the substance of their interview with Ronnie Bland in violation of the hearsay exception contained in the Ohio rules of evidence and the U.S. and Ohio constitutional protections of due process of law, fundamental fairness, compulsory process, confrontation, equal protection, and the right to present a complete defense.

**Ground Seven**: Prosecutorial and police misconduct in the form of the witness intimidation of Ronnie Bland, a defense witness, violated the Petitioner's right to a fair trial, compulsory process, substantive due process and equal protection under the U.S. and Ohio Constitutions.

**Ground Eight**: Trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**Ground Nine**: Prosecutorial misconduct consisting of improper and prejudicial comments by the prosecutor in its rebuttal closing statement violated the Petitioner's right to a fair trial, due process and equal protection under the U.S. and Ohio Constitutions.

**Ground Ten**: Prosecutorial misconduct consisting of knowingly allowing and contributing to perjured testimony from Detective Weeks, violated the Petitioner's right to a fair trial, due process and equal protection under the

U.S. and Ohio Constitutions.

**Ground Eleven**: Ineffective assistance of counsel in failing to investigate or to subpoena witnesses to raise reasonable doubt in violation of the 6th Amendment to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**Ground Twelve**: Ineffective assistance of counsel in failing to operate in Petitioner's best interest and asking for the lesser included offense of voluntary manslaughter in violation of the 6th Amendment to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitutions.

Respondent concedes that the petition was timely filed. However, it is respondent's position that grounds nine through twelve have been procedurally defaulted, and that this default cannot be excused on grounds of ineffective assistance of counsel. Additionally, respondent argues that none of the claims raised in grounds one through eight have merit.

## IV. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). But if, because of a procedural default, the petitioner can no longer present his claims to the state courts, then he has

also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must decide that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

In his traverse, petitioner does not address the four claims which respondent contends have been procedurally defaulted. The Court's review of the record confirms that none of these claims were raised on direct appeal, which is, of itself, a procedural

default, and that petitioner did not appeal from the trial court's decision denying his post-conviction petition, which is, to the extent that these claims were raised there, a second procedural default. Petitioner has not offered any cause and prejudice analysis which might excuse the default, nor has he argued that he had made a substantial showing of actual innocence sufficient to excuse any procedural default. *See Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333 (1992). He has argued, in one of his non-defaulted claims, that the evidence was not sufficient to sustain a conviction for voluntary manslaughter, but the Court will deal with that contention on its merits, and, as the Court's review will show, that claim is not strong enough to warrant relief on its merits, let alone strong enough to excuse a procedural default. Therefore, it will be recommended that grounds nine through twelve be dismissed on procedural default grounds.

## V. STANDARD FOR HABEAS CORPUS REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") that became effective prior to the filing of the instant petition apply to this case. See *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a federal court may not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[ ]" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406–07 (2000)). A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of a petitioner's case. *Coyle*, 260 F.3d at 699. A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Id*. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state

court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. Grounds one through eight of the petition will be evaluated under this standard.

## VI. GROUNDS ONE THROUGH EIGHT

### A. Ground One - Due Process and Double Jeopardy

Petitioner's first claim is that the State violated both the Due Process and Double Jeopardy clauses of the United States Constitution by trying him for a third time on murder charges after the first two trials resulted in a hung jury. He appears to acknowledge that the usual event which triggers application of the Double Jeopardy Clause - namely, the termination of criminal proceeding in the defendant's favor after jeopardy has attached - did not occur here, but he argues that it was fundamentally unfair to subject him to a third trial both due to the hardship he suffered from being imprisoned and having to wait for that trial, and because it gave the State an opportunity to correct deficiencies in its proof in order to obtain the conviction which had eluded it in the two prior trials.

The law is well-established that "a defendant [can] be retried even after the trial judge had, without the consent of the defendant, discharged the jury because of its inability to reach a verdict." *Jones v. Hogg*, 732 F.2d 53, 55 (6th Cir. 1984), *citing United*

*States v. Perez*, 22 U.S. (9 Wheat) 579, 580 (1824).  That is so because "a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected." *Richardson v. United States*, 468 U.S. 317, 326 (1984).

This rule is not, however, absolute, and in certain circumstances successive trials following a mistrial caused by the jury's inability to reach a verdict may be barred by the Double Jeopardy clause.  One of those circumstances, as discussed in *Jones*, is whether a mistrial was declared over the defendant's objection.  If so, the inquiry becomes whether there was "manifest necessity" for the trial judge's decision to declare a mistrial and whether other available alternatives were properly explored.  *See also In re Ford*, 987 F.2d 334 (6th Cir. 1992).   That circumstance does not appear to be present here because the record does not reflect petitioner's objection to the declaration of the first two mistrials, nor does he argue that manifest necessity to declare mistrials on those two occasions was lacking.  Nor is there any other basis on which to apply the Double Jeopardy clause here - as there is, for example, when, after a jury cannot reach a verdict, the courts determine that the prosecution submitted insufficient evidence to obtain a conviction.   The Supreme Court's decision in "*Richardson* ... makes clear that a retrial is not barred [following a mistrial based on a hung jury] unless and until an appellate court enters judgment reversing a conviction on the ground that the evidence was insufficient to support the conviction." *Patterson v. Haskins*, 470 F.3d 645, 657 (6th Cir. 2006).

14

The state court of appeals did not unreasonably apply these principles to petitioner's case. That court cited *Richardson* and concluded that "jeopardy did not terminate when the jury was discharged because of its inability to agree. Consequently, appellant was not subject to a successive prosecution at his retrial, and there are no double jeopardy implications here." *State v. Whiteside,* 2009 WL 1099435, *5. Because the state court correctly identified the controlling legal principle governing Double Jeopardy challenges to retrials after a jury fails to reach a decision, and applied it to these facts in a reasonable way, its decision on this issue is immune from reversal under §2254(d)(1).

In his traverse, petitioner does not disagree that *Richardson* states the general rule. However, he claims that the prosecution and the police acted in bad faith with respect to the investigation and prosecution of the crime. He then cites to *United States v. Dinitz*, 424 U.S. 600 (1976) for the proposition that the Double Jeopardy Clause "bars retrials where 'bad-faith conduct by judge or prosecutor,' *United States v. Jorn, supra*, 400 U.S., at 485, 91 S.Ct., at 557, threatens the '(h)arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *Id.* at 611, *quoting Downum v. United States*, 372 U.S. 734, 736 (1963), and claims that this type of misconduct tainted the first two trials, thus justifying the application of the Double Jeopardy Clause (or the Due Process Clause) to his case.

The state court of appeals did not address this argument directly, perhaps

because petitioner did not phrase his Double Jeopardy or Due Process arguments in these terms when he filed his appellate brief.  He did cite *Dinitz* in that brief, but only for the proposition that the underlying purpose of the Double Jeopardy clause is to promote the defendant's interest in finality and avoiding multiple punishments for the same offense.  Thus, this claim may well not be appropriate for habeas corpus review because it was not fairly presented to the state court.

Even if it had been presented to the state court, this Court cannot find the state court's failure to grant relief on Double Jeopardy grounds to have been unreasonable. *Dinitz* involved a completely different factual scenario in which the trial judge banished defendant's counsel from the courtroom due to his misconduct during opening statements.  The defendant, after being presented with several alternatives, chose to request a mistrial; he then argued that the Double Jeopardy clause barred a retrial.  The Supreme Court, finding that the trial judge's actions were not taken in bad faith in order to goad the defendant into moving for a mistrial, denied relief.  Any discussion of what type of judicial or prosecutorial misconduct might constitute bad faith, and therefore permit the same defendant who moves for a mistrial to take advantage of the Double Jeopardy clause's bar against successive prosecutions, is mere *dictum*.  Further, any persuasive force of the language use in *Dinitz* has been substantially undercut by the Supreme Court's later decision in *Oregon v. Kennedy*, 456 U.S. 667 (1982), where the Court held that a defendant who has moved for a mistrial based on bad faith conduct by the prosecutor cannot successfully invoke the Double Jeopardy clause as a bar to

later prosecution unless the prosecutor not only "overreached" but actually intended to provoke the defendant into moving for a mistrial.

Here, most of the misconduct which petitioner seeks to lay at the feet of the state relates to the police investigation of the crime - in particular, the failure to follow through on testing various items of evidence and the alleged threatening of potential witness Ronnie Brand, which is discussed more fully below - and does not relate to the conduct of the trial. There is simply no evidence from which either the state court of appeals, had it been asked to consider the question, or this Court could conclude that any participant in the state trial process did anything which was intended to provoke petitioner into requesting a mistrial, and, in fact, he never did so. Further, it would be a stretch of the principles discussed in *Dinitz* and *Oregon v. Kennedy* to apply those concepts to the situation where the actual cause of the two mistrials was the jury's inability to reach a verdict. Again, there is no evidence to suggest that the police and prosecutors deliberately failed to investigate the case properly solely in order to force petitioner to stand trial on multiple occasions. They had as much of an interest in obtaining a jury verdict in the first two trials as did petitioner, and there is no suggestion that they "cured" any defects in their investigation prior to the third trial and therefore were able to introduce more compelling evidence against petitioner in that proceeding. Thus, had a state court rejected this argument, it would not have unreasonably perceived or misapplied controlling federal law, and no relief is available to petitioner under the AEDPA as to this portion of his Double Jeopardy claim.

Petitioner's final argument in support of ground one is that the third trial violated his rights under the Due Process clause of the Fourteenth Amendment. This argument was presented to the state court and, to the extent that it appeared to rest on federal rather than state law (and this claim does have a state law component), rejected on grounds that no federal case had ever held that the Due Process clause could be used to bar a retrial after a hung jury. *See State v. Whiteside, supra,* at *5, *citing United States v. Moore*, 1999 WL 35 7760, *4 (6th Cir. May 21, 1999)("neither Michigan nor federal due process guarantees create a right to preclude defendant's retrial").

Petitioner, in his filings in this Court, does not identify such a case, nor did he do so in his state court appellate brief. Rather, after citing to *Ake v. Oklahoma*, 470 U.S. 68 (1985), a case involving the issue of whether the Due Process clause requires a trial court to provide expert witness services to an indigent defendant, petitioner's brief focuses exclusively on the proposition that, under Ohio law, a trial judge has discretion to dismiss a case after several mistrials, and that the trial judge in his case abused his discretion by not doing so. That claim, because it does not raise an issue of federal law, is not reviewable by this Court in the context of a habeas corpus petition. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

Interestingly, the Court of Appeals' unreported decision in *United States v. Moore* has been cited only once - in the *Whiteside* decision. Nevertheless, its observation about the state of federal law appears still to be valid. For example, in *Clark v. Hendricks*, 2005 WL 2789382 (D.N.J. October 25, 2005), *aff'd* 285 Fed. Appx. 933 (3d Cir. 2008), the court

noted that the petitioner had raised a similar state law claim in his state appeal and then attempted to recharacterize it as due process claim in his habeas corpus petition. The court held that the claim was purely a state law claim and did not implicate any federal constitutional right. And the Supreme Court has expressly declined an "invitation to hold that the Due Process Clause provides greater double-jeopardy protection than does the Double Jeopardy Clause." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 116 (2003). Petitioner's citation to cases which hold that, as a matter of a trial court's exercise of its supervisory powers, it may dismiss a case after the jury cannot reach a verdict - cases such as *United States v. Ingram*, 412 F.Supp. 384 (D.D.C. 1976) - does not aid his cause. Those cases do not rely on a constitutional analysis of the issue. *See, e.g., People v. Sierb*, 456 Mich. 519, 525 n. 11 (1998), where the court noted that *Ingram* and similar decisions do not rely on or address the Due Process clause. As a federal habeas court, this Court does not have supervisory powers over the state courts to force them to act, or refrain from acting, in ways that the Constitution neither prescribes nor prohibits. Rather, it can grant relief only to a petitioner being held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). That cannot be said about petitioner's claim that, based on the particular circumstances of his case, a third trial should not have been permitted even if the Double Jeopardy clause did not prevent its going forward. Thus, no relief is available to petitioner on ground one.

### B. Ground Two - Sufficiency of the Evidence

Petitioner's next claim is that the evidence presented during his third trial, which

was the only one in which the jury was instructed not only as to a murder charge but also the charge of voluntary manslaughter, was constitutionally insufficient. The Court does not read his claim as arguing that the evidence, although circumstantial, could not have allowed the jury to find beyond a reasonable doubt that he shot Mr. Armstrong, but rather that there was insufficient evidence to support a finding that he was "under the influence of sudden passion or in a sudden fit of rage, either of which [was] brought on by serious provocation occasioned by the victim that [was] reasonably sufficient to incite the person into using deadly force," *see* Ohio Rev. Code §2903.03(A), when and if he did so. He notes that there were no eyewitnesses to the actual shooting and no one who observed him interacting in any way with Mr. Armstrong in the minutes before the shooting took place. Therefore, he asserts that the jury could not have found, beyond a reasonable doubt and based on the evidence, that he was in the throes of a fit of passion or rage when the shooting occurred, and for that reason he could not properly have been found guilty of voluntary manslaughter.

As this Court explained in *Lynch v. Hudson*, 2011 WL 4537890, *81-82 (S.D. Ohio September 28, 2011) (Frost, J.),

> In *Jackson v. Virginia* {443 U.S. 307 (1979)], the United States Supreme Court held that as a matter of fundamental due process, a criminal conviction cannot stand unless each essential element is proven beyond a reasonable doubt. 443 U.S. at 316. The Supreme Court explained that when reviewing a challenge to the constitutional sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The Supreme

Court cautioned, with respect to the role of a reviewing court, that "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Thus, after reviewing the evidence in a light most favorable to the prosecution and respecting the trier of fact's role in determining witnesses' credibility and weighing the evidence, a federal court must grant habeas corpus relief "if it is found that upon the record evidence at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324.

It is important to remember when reviewing a sufficiency of the evidence challenge that this Court "do[es] not reweigh the evidence, re-evaluate the credibility of the witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir.2009). If the record contains credible, competent evidence enabling a rational jury to find each essential element beyond a reasonable doubt, then Petitioner's challenge to the sufficiency of the evidence fails. *Cf. Matthews v. Abramajtys*, 319 F.3d 780, 788–89 (6th Cir.2003) ("The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim.").

*Further, as the Sixth Circuit has explained, "[i]n a habeas proceeding, however, we cannot simply conduct de novo review of the state court's application of [the *Jackson v. Virginia*] rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of the AEDPA." *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir.2008). In *Tucker v. Palmer,* 541 F.3d 652 (6th Cir.2008), the Sixth Circuit explained in more detail:

> Accordingly, the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by Jackson; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by the AEDPA.

*Id*. at 656. *See also Parker v. Renico*, 506 F.3d 444, 448 (6th Cir.2007); *Nash v. Eberlin,* 258 F. App'x 761, 765 (6th Cir.2007). This Court recognizes, however, that "even after AEDPA, [the Court] must 'distinguish reasonable speculation from sufficient evidence' when reviewing a state court's application of *Jackson*." *Smith v. Romanowski*, No. 07–1578, 2009 WL 1884451, at *6 (6th Cir. Jul.1, 2009) (Moore, J., dissenting) (quoting *Brown v.*

*Palmer*, 441 F.3d 367, 352 (6th Cir.2006)).

The state court of appeals correctly cited the *Jackson* standard when reviewing petitioner's claim regarding the sufficiency of the evidence, so the only issue here is whether it unreasonably applied that standard to the facts and to the jury's verdict. In holding that "based on the evidence and the testimony of all the witnesses, viewed in a light most favorable to the prosecution, as is required, a reasonable trier of fact could have found beyond a reasonable doubt that appellant was indeed guilty of voluntary manslaughter, " *Whiteside, supra,* at *10, the court extensively recounted the evidence the jury heard, but did not focus specifically on petitioner's claim that none of that evidence supported, even circumstantially, a finding that he acted under the influence of passion or rage which was provoked by the victim. Similarly, in defending the state court's resolution of this claim, respondent asserts that "the circumstantial evidence here heavily pointed to Whiteside as the killer," Return of Writ, at 36, without specifically addressing his claim regarding the "rage or passion" element of the voluntary manslaughter charge, other than to say that his claim that "no one saw him and Armstrong acting angry toward each other prior to the shooting" is "mostly a complaint regarding the lack of direct evidence." *Id*.

Neither the state court nor respondent has identified any direct evidence that would support the jury's finding on this issue, and there does not appear to be any. As far as circumstantial evidence is concerned, witness Lewis reported seeing petitioner

speaking to Armstrong, and the two of them then leaving in different directions, just moments before the shots were fired. Witness Peterson said she heard gunshots about five minutes after seeing Armstrong ride his bicycle toward Lewis' apartment. Several witnesses heard Armstrong make threats about shooting up the apartment, and several witnesses also saw (but did not hear) the subsequent confrontation between him and petitioner, but, as the state court observed, "no one appeared to be yelling" during this confrontation. *Whiteside, supra,* at *2. Witness Lewis, for example, testified that no one's voices were raised and that she did not see any hand gestures or movement except for petitioner's constantly putting his hand back to the pocket where he had his gun. (Trial Transcript, at 558-59). And witness Reeves, who also saw the confrontation, said that the two were "just standing there talking" and that she heard no yelling or screaming and saw no aggressive movements. (Trial Transcript, at 773-74). She also reported hearing shots just moments after the two separated and began walking away from each other. (Trial Transcript, at 778-80).

Ohio law appears to treat voluntary manslaughter as "an inferior degree of murder, meaning that the elements of voluntary manslaughter are contained within those of murder, except for one or more additional mitigating elements." *State v. Levett*, 2006 WL 1191851, *4 (Hamilton Co. App. May 5, 2006), *citing State v. Shane*, 63 Ohio St. 3d 630, 632 (1992). A trial court judge in Ohio should instruct the jury on that offense, when the defendant is also charged with murder, only if "the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a

23

conviction for voluntary manslaughter." *State v. Shane, supra.* It would stand to reason, then, that evidence - even strong circumstantial evidence - that petitioner shot Mr. Armstrong is not, of itself, proof of the mitigating element required for a voluntary manslaughter conviction, and that something besides proof of the killing itself must have been presented in order to sustain a conviction for that offense.

However, under Ohio law, the State does not have the burden of proving the existence of this mitigating factor beyond a reasonable doubt, as it does with the other elements of the crime. In fact, Ohio law places the burden on the defendant to prove the existence of this factor by a preponderance of the evidence. *State v. Perdue*, 153 Ohio App.3d 213, 217 (Mahoning Co. App. 2003), *citing State v. Rhodes*, 63 Ohio St. 3d 613 (1992). With regard to evidence showing the existence of this mitigating factor, the *Rhodes* court stated:

> If a defendant is not charged with murder or aggravated murder, but rather is on trial for voluntary manslaughter, neither party is required to establish either of the mitigating circumstances. Rather, the court presumes (to the benefit of the defendant) the existence of one or both of the mitigating circumstances as a result of the prosecutor's decision to try the defendant on the charge of voluntary manslaughter rather than murder. In that situation, the prosecution needs to prove, beyond a reasonable doubt, only that the defendant knowingly caused the death of another, and it is not a defense to voluntary manslaughter that neither party is able to demonstrate the existence of a mitigating circumstance

*State v. Rhodes*, 63 Ohio St. 3d at 618. This would seem to suggest that, under Ohio law, a jury may convict a defendant of the crime of voluntary manslaughter even if the evidence would support only a charge of murder, and that the presence or absence of

evidence about the mitigating factor which distinguishes voluntary manslaughter from murder is of no moment; in other words, that even if the record is completely devoid of evidence as to this factor, a successful claim under *Jackson v. Virginia* cannot be made out as long as there is sufficient proof on the elements as to which the State bears the burden. If that is so, petitioner's argument would be completely undercut.

Federal law supports this interpretation of how the mitigating factor which reduces murder to voluntary manslaughter interacts with the due process requirement that a conviction be supported by sufficient evidence as to each and every element of the crime. For example, in *United States v. Quintero*, 21 F.3d 885, 890-91 (9th Cir. 1994), the court explained that under federal law (as under Ohio law) in order "[t]o convict a defendant charged with murder of voluntary manslaughter, the government must prove that (1) the defendant intentionally inflicted an injury upon another from which the other died; and (2) the homicide was committed without justification or excuse" and that "[s]udden quarrel or heat of passion are simply not essential elements of voluntary manslaughter, and therefore, they need not be proven by evidence beyond a reasonable doubt." Thus, in a case where the defendant succeeds in persuading the trial court that the evidence would support an instruction on voluntary manslaughter, and the trial court so instructs the jury, if a conviction on that count is returned and the defendant then challenges the conviction on grounds of insufficient evidence, a reviewing court's "role ... is confined to determining whether a jury could reasonably find that the government presented sufficient evidence to conclude beyond a reasonable doubt that

the defendant intentionally committed an unexcused killing of a human being." *Id*. at 891. This interpretation is entirely consistent with the observation made by the Court of Appeals for this Circuit that "the construction placed upon the [voluntary manslaughter] statute by the Ohio Supreme Court is that sudden passion or 'in a sudden fit of rage' is not an element of voluntary manslaughter." *Rhodes v. Brigano*, 91 F.3d 803, 809 n. 2 (6th Cir. 1996), *citing State v. Muscatello,* 55 Ohio St.2d 201, 378 N.E.2d 738, 738 (1978)("Extreme emotional stress, as described in R.C. 2903.03, is not an element of the crime of voluntary manslaughter").

All of this leads to the conclusion that petitioner's sufficiency of the evidence argument, while superficially appealing, is fundamentally misdirected. The proper inquiry here is not whether there was, or was not, either sufficient evidence, or any evidence, from which the jury could have found that petitioner acted in the heat of passion or rage. The Due Process clause requires only that there be sufficient evidence as to the elements of the crime that the State is required to prove beyond a reasonable doubt, and that is not one of those. The state court of appeals, by focusing on the evidence from which a jury might have found that petitioner shot Mr. Armstrong, correctly confined its inquiry to what the State was required to prove, and that approach neither conflicts with any federal law to the contrary, nor unreasonably applies *Jackson v. Virginia* to the facts of this case.

In that regard, the state court of appeals made this finding:

While this case does indeed turn on circumstantial evidence, the Supreme

Court of Ohio has held that "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin* (1991), 62 Ohio St.3d 118, 124, 580 N.E.2d 1, *citing State v. Nicely* (1988), 39 Ohio St.3d 147, 154-55, 529 N.E.2d 1236. In fact, circumstantial evidence may " ' "be more certain, satisfying and persuasive than direct evidence." ' " *State v. Ballew* (1996), 76 Ohio St.3d 244, 249, 667 N.E.2d 369, *quoting State v. Lott* (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293, *quoting Michalic v. Cleveland Tankers, Inc.* (1960), 364 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20. As will be explained, we find that there is sufficient evidence in the record to establish the shooter's identity in this case.

Lewis testified she and Armstrong had recently broken up and she had just met appellant, who she only knew as "Nut" on September 14, 2005. Lewis further testified that appellant and two men came to her apartment around midnight of September 14, 2005 to smoke marijuana. While she, appellant, Reeves, and Lovett were in her kitchen, the two other men were in her living room. Armstrong rode by on his bicycle, and an exchange occurred between Lewis and Armstrong. Though Lewis told appellant to disregard Armstrong's comments, appellant said something to the two men in the living room, and all three men left. The three men came back inside, then left again out the back door. Appellant and Armstrong talked, and the two men went towards the truck. Appellant and Armstrong then went in opposite directions-Armstrong towards his sister's apartment, and appellant towards the truck. A few moments later, Lewis heard five to six gunshots. She testified that, as she ran outside, appellant ran out of a pathway from where the shots were fired. Appellant ran past Lewis with a gun in his right hand at his side. As they passed, Lewis said to him, "You got to be F'd up; I'm calling the police." (Tr. 563.) Lewis called 911 and heard the truck squeal its tires as it sped off.

Reeves testified she lived at 1983 Maryland Avenue during the time of the shooting. She was at Lovett's apartment and the two went to Lewis's apartment that night. Appellant was in Lewis's kitchen and had a revolver on his lap which he later put away. The three women were in the kitchen with appellant, and the two other men were in the living room. Lewis was sitting on appellant's lap, and Armstrong rode by on a bicycle a few times. Armstrong exchanged words with Lewis. Thereafter, appellant said something to the men in the living room and went outside. Appellant entered the apartment again, then left and was talking to Armstrong in the parking lot. According to Reeves, Armstrong was just standing there, and appellant was "holding the handle of the gun." (Tr. 776.) Armstrong then

turned and walked away, and appellant walked the other direction. Moments later Reeves heard "like seven" gunshots, and she and Lewis ran out the front door. (Tr. 780.) Reeves stated she saw appellant running out of the "cut between" the buildings with a gun in his hand. Reeves testified as follows:

I think it was in the right hand because when he-when he came out this cut right here and he seen me and Erica right here, he pointed it at us at about right here, and the truck was right like right along in here.

And, Erica, Erica's distraught, get to screaming at him. And he like he dropped his arm back down, and he ran to the car.

Erica took off this way through this cut. I ran back this away up this cut.

(Tr. 782.)

Reeves then heard the truck squeal its tires as it sped out of the parking lot. Reeves and Lewis ran towards Irvin's apartment and found Armstrong bleeding from his mouth.

Columbus Police Detective John A. Weeks testified Lewis told him in an interview at the scene that "Nut" was the responsible party. After getting a tip on the identity of Nut, Detective Weeks showed Lewis a photo array. Lewis identified appellant out of the photo array on September 16, 2005, as did Reeves approximately 30 minutes later.

Lovett testified she lived at 1982 Maryland Avenue at the time of the shooting. On the night of September 14, 2005, she and Reeves were together when Lewis came over to her apartment. As they walked into the kitchen, appellant was sitting in a chair with a gun, described as a revolver, on his lap that he later put in his back pocket. Two other men were in the living room. Armstrong rode by on a bicycle a few times, then stopped and said something and gave mean looks to Lewis. After Armstrong left, appellant got up, said something to his friends in the living room, and the three men went outside. The two men went to the truck while appellant went some other direction. Lovett heard "two, maybe three gunshots" and the three women ran out the front door though Lovett stopped at the doorway. (Tr. 689.) Lovett saw appellant run around the corner coming from where she heard the shots. Lovett stated: "He was running, and he had like I figured it was a gun because it was the

shiny silver that I seen, and he pointed it at us." (Tr. 695.) According to Lovett, after he pointed the gun, appellant "got in the truck" and "speeded off." (Tr. 697-98.)

Irvin, Armstrong's sister, lived at 1986 Maryland Avenue. She was preparing for bed that night when she heard four to six gunshots. When Irvin opened her door, she saw Armstrong bleeding on the porch where he died. Irvin saw Lewis running towards Irvin's apartment screaming "my baby, my baby." (Tr. 415.)

Sharelle Stubbs ("Stubbs") was at Irvin's apartment that night and heard approximately four gunshots and then pounding on the door. Irvin opened the door and Stubbs saw Armstrong standing there. Stubbs testified she told the police to talk to Lewis.

Toshia Estridge ("Toshia") lived next door to Irvin and heard approximately seven gunshots. Toshia heard banging on the door and opened it to see Armstrong. Toshia saw no one leaving, but remembers Reeves and Lewis running up and that Lewis was on the phone saying "they shot my baby." (Tr. 462.)

Takia Estridge ("Takia"), Toshia's sister, testified she was at Toshia's when she heard approximately five to six gunshots. Takia did not see anything, but heard someone outside say, "they shot my baby." (Tr. 469.)

Peterson, who met appellant earlier that day, also lived at the Nelson Park apartments. Peterson was on her porch that night and saw Armstrong ride towards Lewis's apartment on a bicycle. About five minutes later, Peterson heard shots and ran towards Irvin's apartment. Peterson saw "the truck driving off real fast." (Tr. 491.) When she arrived at Irvin's apartment, Peterson saw Armstrong lying on the steps.

We find that based on the evidence and the testimony of all the witnesses, viewed in a light most favorable to the prosecution, as is required, a reasonable trier of fact could have found beyond a reasonable doubt that appellant was indeed guilty of voluntary manslaughter. Therefore, we cannot conclude there is insufficient evidence to sustain appellant's conviction.

*State v. Whiteside*, 2009 WL 1099435, *8-10. This Court agrees. Therefore, petitioner's

second claim lacks merit.

### C. Ground Three - Ex Post Facto Violation

In ground three, petitioner claims that he was sentenced in violation of the Ex Post Facto clause of the Constitution because the offense for which he was sentenced was committed before the Ohio Supreme Court decided *State v. Foster*, 109 Ohio St. 3d 1 (2006), but the trial court applied the sentencing regime laid down by *Foster* instead, and that by doing so, petitioner received a longer sentence. As respondent points out, this argument has been uniformly rejected both by Judges of this Court and by Judges in the Northern District of Ohio. *See, e.g. West v. Kelley*, 2010 WL 2465334 (S.D. Ohio June 14, 2010)(Kemp, M.J.), *adopted and affirmed* 2010 WL 2663208 (S.D. Ohio July 1, 2010) (Frost, J.); *see also Rettig v. Jefferys*, 557 F.Supp. 2d 830, 841 (N.D. Ohio 2008). Petitioner has not persuaded the Court that a different result should be reached here. As this Court observed in *West*, 2010 WL 2465334, *23, "[p]etitioner faced the same penalty ranges in sentences for his convictions prior to and after *Foster*." That is true here as well; *Foster* did not change the maximum sentence available for the crime of voluntary manslaughter, and petitioner's sentence did not exceed that maximum.

Certainly, in light of the uniformity of the decisions from the Ohio District Courts on this issue, and in the absence of any contrary authority from either the United States Supreme Court or the Court of Appeals for the Sixth Circuit, the state court of appeals could not have acted unreasonably by rejecting this claim on the merits, as it did. *See State v. Whiteside, supra*, at *12-*13. This Court, too, concludes that this claim lacks merit.

### D. Ground Four - Compulsory Process (Witness Bland)

In his fourth ground for relief, petitioner argues that his constitutional right to compulsory process, which permits a criminal defendant to summon witnesses on his own behalf, was violated because the trial judge refused to allow him to call Ronnie Bland as a witness. Mr. Bland had been questioned by the police and had suggested that another person was the actual shooter; evidence from the various trials shows that the police were not terribly impressed with this evidence and may have used threats in an attempt to make Mr. Bland either change that part of his story or implicate petitioner. Petitioner wanted to call Mr. Bland to testify at the third trial, but, as the court of appeals explained, "Bland had court-appointed counsel who indicated to the court that if called to testify, Bland would assert his Fifth Amendment rights." *State v. Whiteside, supra*, at *13. The trial judge conducted a voir dire of Mr. Bland to determine if, in fact, he would do so; when he did, the trial judge refused to allow petitioner to call Mr. Bland to the stand simply in order for him to assert his right against self-incrimination and refuse to answer any of petitioner's questions. The court of appeals found that this ruling did not violate petitioner's constitutional rights, holding that "there is no 'right' of defendant to call a witness solely for the purpose of invoking his or her Fifth Amendment rights in front of the jury." *Id*.

Petitioner's argument in this Court has a slightly different twist. Here, relying on language from cases such as *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001), to the effect that "[v]arious prosecutorial and judicial actions aimed at

discouraging defense witnesses from testifying deprive a defendant of th[e] right" to present witnesses in his own defense," he asserts that the reason that Mr. Bland invoked the Fifth Amendment was that he had been improperly threatened or coerced by the police, and that the trial judge was aware of that fact. Therefore, by not allowing him to call Mr. Bland, the trial judge implicitly acquiesced in these improper police tactics and became a part of the improper denial of the right to call witnesses.

The state court did not address this argument directly, perhaps, again, because petitioner did not phrase it in this way either in his brief before the state court of appeals or in his further appeal to the Ohio Supreme Court. In those briefs, his primary argument was that controlling Ohio precedent, *City of Columbus v. Cooper*, 49 Ohio St.3d 42 (1990), required the trial judge to allow petitioner to call Mr. Bland to the stand. Paragraph one of the syllabus in *Cooper* reads as follows: "Pursuant to the Compulsory Process Clause of Section 10, Article I of the Ohio Constitution, a trial court may not exclude a person who has previously asserted his right against self-incrimination from appearing as a witness on behalf of a criminal defendant at trial." The state court of appeals rejected this argument, holding that *Cooper* was subsequently limited to its facts by *State v. Kirk,* 72 Ohio St.3d 564 (1995), and that under *Kirk*, the trial judge had the discretion to refuse to allow Mr. Bland to be called as petitioner's witness. Paragraph one of the syllabus in that case reads: "A trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth

Amendment privilege against self-incrimination. (*Columbus v. Cooper* [1990], 49 Ohio St.3d 42, 550 N.E.2d 937, distinguished and limited.)" This issue of Ohio constitutional law is not, of course, subject to review in this Court, and to the extent that petitioner has altered his federal constitutional argument here, it may not have been fairly presented to the Ohio courts and may have been procedurally defaulted or waived.

As to the claim which was presented to the Ohio courts - namely, that the trial judge should have allowed petitioner to call Mr. Bland as a witness even if he would do nothing more than assert his privilege against self-incrimination - respondent correctly cites to *Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005), for the proposition that "the Supreme Court has never held that permitting a witness to assert his or her Fifth Amendment privilege against self-incrimination without taking the witness stand violates a defendant's right to a fair trial ...." That continues to be the state of the law. *See, e.g., United States v. Bates,* 552 F.3d 472, 476 (6th Cir. 2009) ("when a defendant has a clear entitlement to claim the privilege, forcing the defendant to take the stand is 'futile' and thus unnecessary"). The state court of appeals' resolution of this issue against petitioner is neither contrary to, nor an unreasonable application of, federal law, and thus immune from reversal by this Court.

In ground seven, petitioner claims that he was similarly deprived of his right to call Mr. Bland as a witness due to what he claims were improper police questioning tactics. This claim covers the substance of the way in which he has argued ground four in this Court. Obviously, if the police did not act improperly so as to deprive petitioner

of his right to call Mr. Bland as a witness, even if the trial judge was aware of this alleged misconduct and ratified it by refusing to allow Mr. Bland to be called, that could not have been constitutional error. Therefore, the Court will defer the remainder of the discussion of this issue until it analyzes petitioner's seventh ground for relief.

### E. Ground Five - Right to Confront Witnesses (Witness Lewis)

In his fifth ground for relief, petitioner claims that his constitutional right to confront the witnesses called to testify against him was violated when his counsel was not allowed to ask Ms. Lewis questions about a pending forgery charge. While Ms. Lewis did testify about the events which occurred on the night in question, the trial judge did not allow her to be questioned (and to invoke her Fifth Amendment right, which she was prepared to do) in front of the jury about the details of a pending forgery charge. According to petitioner, because forgery is a crime involving falsehood or deception, the details of her behavior would have been relevant to the jury's assessment of her credibility. The court of appeals treated this claim as if it raised the same issue involving the refusal to permit Mr. Bland to take the witness stand, and overruled it for the same reasons. Again, this may well have been due to the fact that in his appellate brief, petitioner essentially treated the two claims as raising the same issue; his entire argument on this assignment of error was that the trial court's refusal to permit these questions to be posed to Ms. Lewis in front of the jury, even if she did no more than assert her right not to incriminate herself, "deprived Appellant of his right to confront his accuser, his rights to due process of law under the Federal and Ohio Constitutions,

his ability to question her under Evid.R. 608(B), and the other rights and progeny set forth in the previous assignment of error."  Appellant's brief, Ex. 17, at 27.

Certainly, to the extent that his claim is simply that he should have been allowed to pose these questions to Ms. Lewis in the jury's presence, this claim would appear to be foreclosed by the Court's disposition of ground four.  If it is not a constitutional violation to keep a witness off the stand altogether because that witness would simply invoke the Fifth Amendment, it is hard to see how it could be error to make a similar ruling with respect to a witness already on the stand.  The end result is no different - in either case, the jury is not made privy to the fact that the witness has invoked the Fifth Amendment.  Additionally, any argument based on the Ohio Rules of Evidence is not properly before the Court.  That leaves only the Confrontation Clause argument with respect to this particular set of questions.

The Supreme Court has held that the right to impeach a witness with evidence of prior criminal convictions may be one of the rights provided to a criminal defendant by the Confrontation Clause.  *See Davis v. Alaska*, 415 U.S. 308, 316-17 (1974).  However, there are times when the right to cross-examine a witness as to such evidence may have to yield to some other right, such as the Fifth Amendment privilege against self-incrimination.  A number of courts have developed a balancing test for this situation, which involves determining if the questions which the witness refused to answer were "collateral" to the witness' direct testimony and, if not, whether the defendant was able meaningfully to cross-examine the witness about the direct testimony in spite of the

witness' assertion of the privilege.  *See, e.g., Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir. 1991).  Under this approach, matters relating exclusively to credibility are deemed to be "collateral" and the invocation of the Fifth Amendment in response to such questions does not violate the Confrontation Clause or require that the direct testimony be excluded.  *Id; see also United States v. Cardillo*, 316 F.2d 606, 611 (1963).

Here, petitioner never made a request that any portion of Ms. Lewis' direct testimony be stricken based on her refusal to answer questions about the forgery charge, so the trial court was never asked to balance the effect of her refusal to answer those questions against the impact of her direct testimony.  But it is clear from these cases that the Confrontation Clause does not render the invocation of the Fifth Amendment privilege improper or provide any justification for the trial court to compel the witness to answer questions; rather, it requires that any prejudice to the defendant caused by the witness' failure to answer be addressed, usually by instructing the jury not to consider any part of the direct testimony which could not, because of the invocation of the Fifth Amendment, be adequately explored on cross-examination, and, if the cross-examination is on collateral issues such as credibility, usually by doing nothing at all due to the lack of prejudice.

Here, it is clear that the questions which counsel intended to ask related solely to the collateral issue of Ms. Lewis' credibility.  He told the trial judge he wanted to ask her about whether she had a pending forgery charge and if she had admitted to that crime.  (Trial Tr., at 584).  The record reflects that at the time she testified, she had been

accepted into a diversion program, meaning that she had not been convicted of the charge and that it might ultimately be dismissed. Because it was not a conviction, the trial judge originally ruled that such questions were not permitted under Ohio Evid.R. 608(B). The issue was later revisited, after the trial judge reversed that ruling, by way of an *in camera* examination of Ms. Lewis after the court appointed counsel for her. Petitioner's counsel then asked a series of questions about the forgery charge and the underlying conduct, almost all of which were met with the invocation of the Fifth Amendment privilege. (Trial Tr., at 822-25). The trial judge then refused to allow these same questions to be asked in the presence of the jury.

It is clear to this Court that there was no Confrontation Clause violation here. The questions asked were sufficiently collateral to Ms. Lewis' direct testimony, which was effectively cross-examined by petitioner's counsel, so that the absence of this testimony did not prejudice petitioner's ability to confront Ms. Lewis in the way that the Constitution requires. Further, she did not answer the questions, and would not have answered them before the jury, so that the jury would not actually have learned anything about the forgery charge. Petitioner did not assert at trial, and does not assert now, that her use of the Fifth Amendment as a basis for refusing to answer these questions was in any way improper. And, finally, to the extent that he argues that the way in which to remedy any Confrontation Clause issue here was to force Ms. Lewis to invoke the Fifth Amendment in the jury's presence, rather than to redact some portion of her direct testimony due to counsel's inability to conduct an effective cross-

examination, the cases simply do not support that argument. Thus, even had he made this precise argument to the state court, that court would not have acted unreasonably or in contravention of federal law by rejecting it. Again, that is sufficient to insulate the state court's ruling from being reversed by this Court, and no relief is available to petitioner on ground five.

### F. Ground Six - The Ronnie Bland Interview

In his sixth ground for relief, petitioner takes issue with the trial court's refusal to permit Ronnie Bland's interview with the police to be admitted and, to some extent, the restrictions placed by the trial judge on counsel's questions relating to this subject. In his traverse, petitioner characterizes this claim as one which arises under *Brady v. Maryland*, 373 U.S. 83 (1963), which deals with the State's failure to disclose exculpatory evidence to the defense. This is clearly not a *Brady* claim, however, because the evidence in question - Mr. Bland's interview with the police where he suggests another suspect to them, and their treatment of Mr. Bland at that interview - was fully known to defense counsel and was the subject of motions practice before the trial court. The gist of this claim, at least as it was presented to the state courts, is that Mr. Bland's statements were admissible under various exceptions to the hearsay rule and that the trial court's exclusion of these statements violated petitioner's rights under the Due Process Clause, the Compulsory Process Clause, the Confrontation Clause, and the Equal Protection Clause. The only one of those arguments supported by any case law was the Due Process argument concerning the right to present a complete defense.

The state court of appeals held, first, that all of the issues concerning exclusion of Mr. Bland's statements were litigated in the context of the second trial, and that counsel never sought to introduce those statements at the third trial. In his appellate brief, petitioner cited to pages 858-863 of the transcript of the third trial as evidence that he preserved this issue for review. It is not entirely clear that he did so; the specific issue which led to the colloquy found on those pages was the trial court's refusal to allow Mr. Bland to be called as a witness because he would be invoking the Fifth Amendment. Counsel did indicate an intent to proffer the tape or a transcript of Mr. Bland's police interview, but a fair inference from the context of that proffer is that it would simply show what Mr. Bland would have said had he been allowed to testify (and had he not chosen to invoke the Fifth Amendment). However, there was a reference in that colloquy (albeit by the prosecuting attorney) to the effect that "we can't use his transcript, nor can we use his tape ...." (Trial Tr., at 861). That may be an indication that all parties understood that any rulings made about the admissibility of the tape or transcript during the prior trial had continued vitality. Thus, the Court will assume, for purposes of discussion, that petitioner did preserve his objection to the trial court's ruling that the tape or transcript, including Mr. Bland's statements about other potential suspects, was not admissible.

Since this is not a *Brady* issue, and because the Court has already determined that the trial judge's decision not to allow Mr. Bland to be called to the witness stand did not violate the Confrontation Clause, what remains is the claim - supported in petitioner's

appellate brief with a citation to *Holmes v. South Carolina*, 547 U.S. 319 (2006) - that the judge's refusal to allow petitioner to introduce this evidence denied him a meaningful opportunity to present a complete defense. The state court implicitly addressed this argument by noting that, although the interview was not admitted into evidence, petitioner was permitted to cross-examine the interviewing detective and to bring out the fact that Mr. Bland had identified another individual (Calvin Parker), who had died before the third trial, as a possible suspect. Thus, it apparently concluded that petitioner had a meaningful opportunity to present this evidence, although not in the precise form he desired.

The Supreme Court has "long interpreted [the Due Process Clause] to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U. S. 479, 485 (1984). This does not mean, however, that a defendant has the unqualified right to introduce any and all evidence bearing upon his guilt or innocence; rather, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). The *Scheffer* court also noted that many evidentiary rules operate to prevent a defendant from introducing evidence that might have some bearing on guilt or innocence, and that this does not necessarily infringe upon the right to present a meaningful defense. As the Court stated, " State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of unreliable evidence is a

principal objective of many evidentiary rules." *Id*. at 309. In *Sheffer*, the Court upheld the exclusion of polygraph evidence, notwithstanding the fact that a number of experts believe in its probative value, because "there is simply no consensus that polygraph evidence is reliable." *Id*.

While the rules against introduction of hearsay evidence are generally designed to serve the same purpose - that is, to guard against the introduction of unreliable evidence - there are times when such rules must yield to constitutional constraints. For example, in *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held that Mississippi's failure to provide a hearsay exception for statements made against penal interest - in that case, a witness' confession to having committed the murder for which the defendant was standing trial - violated the Due Process Clause because it prevented the defendant from introducing evidence that was both "trustworthy" and "critical to [the defendant's] defense." As the Court observed, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*. at 302.

These principles are context-specific, however, and must be evaluated in light of the totality of the evidence presented at the trial. In other words, even if, on balance, reliable and probative evidence is either properly excluded under a hearsay rule, or improperly excluded due to a trial judge's misapplication of the hearsay rules, that exclusion does not result in constitutional error unless "'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006), *quoting*

*Washington v. Schriver,* 255 F.3d 45, 57 (2d Cir. 2001). If the same evidence was before the jury in some other form, any error resulting from a misapplication, or unconstitutional application, of state evidentiary rules is considered harmless. *See Blackwell*, 459 F.3d at 755 (holding that the exclusion of testimony from certain witnesses that someone other than the defendant tipped them about an impending buyout of a corporation's stock, which the defendant allegedly tipped others about, was harmless because "the jury was aware" from other testimony that more than one corporate insider knew of the buyout in advance).

Here, there is little analysis from the state court on this claim, perhaps because that court concluded that a substantial portion of the claim had not been preserved for review. The court did, however, find the claim to be without merit. When a state court decision adjudicates a claim on its merits but does not articulate a rationale, this Court may not review that decision *de novo*, but it must "conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Of course, if the state court decision "produce[d] no results or amount[ed] to no ruling at all," this Court's review is *de novo*. *Loza v. Mitchell*, 705 F. Supp. 2d 773, 801 (S.D. Ohio 2010), *citing McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir. 2003) . Here, it does matter which standard is used, because the trial court's exclusion of the evidence in question does not amount to constitutional

error.

The primary point of introducing Mr. Bland's interview or statements was to show the jury that another suspect besides petitioner had been identified. But his counsel examined Detective Weeks, one of the police officers who did the interview, about this very subject, and the jury heard from that testimony that Mr. Bland had provided the police with "a name different from Mr. Whiteside's" of a person who was supposedly present on the night in question. Mr. Bland had also said that the person had subsequently been the victim of a homicide, and the police tried unsuccessfully to identify him based on that information. Counsel then showed the witness an obituary of a Calvin Parker who had been a shooting victim in that same area on a later date, implying that Mr. Parker was the person identified by Mr. Bland. *See* Trial Tr. 943-46. Because this information was basically the same as the information in the interview, at least as it relates to the possibility that someone other than petitioner was the shooter, and because petitioner was permitted to introduce it through Detective Weeks' testimony, the exclusion of Mr. Bland's out-of-court statements to the same effect did not deprive petitioner of his right to present a meaningful defense. Thus, even if the trial judge should have allowed those statements to come in under some exception to the hearsay rule - and this Court does not reach that conclusion, since it is not necessary to do so in order to resolve this claim - there is no basis for granting relief based on petitioner's sixth ground for relief.

### G. Ground Seven - Prosecutorial and Police Misconduct

Petitioner's seventh ground for relief brings into play the alleged misconduct surrounding Mr. Bland's police interview. As the factual basis for this claim, he notes that when Mr. Bland was interviewed by the police, they expressed great displeasure with his suggestions that petitioner was not the shooter, to the point of threatening to charge him with murder and also telling him that he was "putting a noose around his neck" by failing to be cooperative. He appears to claim that, as a result of these threats, Mr. Bland became unavailable to him as a witness, and that this violated his rights under the Compulsory Process Clause.

The state court overruled petitioner's assignment of error raising this claim on two grounds. First, it concluded that the reason Mr. Bland was unavailable as a witness was not because he had been intimidated or threatened by the police, but because "Bland's counsel advised Bland to assert his Fifth Amendment rights ...." *State v. Whiteside, supra,* at *16. Second, to the extent that the evidence of the detectives' treatment of Mr. Bland had any independent evidentiary value, as, for example, tending to show that they were unduly focused on petitioner as a suspect and unwilling to consider other possibilities, the court of appeals noted that this information "was set forth for the jury's consideration as it was explored during the cross-examination of Detective Weeks." *Id.* Again, the question is whether this ruling is contrary to, or an unreasonable application of, clearly established federal law.

In his appellate brief, petitioner relied heavily on the Court of Appeals' decision in *United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001) as support for this claim; in

this Court, he also cites to *Webb v. Texas*, 409 U.S. 95 (1972), a decision cited in *Emuegbunam*. Neither of these decisions supports petitioner's claim that the state court of appeals unreasonably denied him relief on grounds of police or prosecutorial misconduct.

Turning first to *Webb*, in that case, after the defendant called his sole witness, the trial judge, on his own initiative, warned the witness that if he did not testify truthfully, the judge would "personally" refer his case to the grand jury and that, if convicted, the witness would get a sentence to serve consecutively to the ones he was already serving. He also said it would affect the witness' chance at parole. The witness, not surprisingly, then refused to testify, and the judge excused him. The Supreme Court held that these facts made out a clear violation of the Due Process Clause because the trial judge clearly prevented the defense from presenting its case.

In *Emuegbunam*, the Court of Appeals reiterated that the right of a defendant to present his own witnesses stems from the Due Process and Compulsory Process Clauses, and that either the prosecution or the court can deny a defendant of this right through witness intimidation. At the same time, *Emuegbunam* noted that there are times when it is appropriate to caution a witness about the consequences of either giving false testimony, or testifying at all. Therefore, a claim of this type can be made out, according to the *Emuegbunam* court, only if the government's conduct amounts "to a substantial interference with a witness's free and unhampered determination to testify ..." Even then, if there has been a constitutional violation made out, that violation "is subject to

harmless error analysis." *Emuegbunam*, 268 F.3d at 400. The Court of Appeals found no violation in that case because the witness made his decision not to testify not based on improper threats from his jailers, as the defendant had alleged, but on the basis of independent and correct advice from both his counsel and the trial judge about the consequences of testifying.

Here, this Court is bound to accept the state court of appeals' conclusion that Mr. Bland chose not to testify based on his lawyer's advice about the potential for self-incrimination and not based on whatever threats had been made to him at his police interview, which occurred many months before the trial. The record bears that out; Mr. Bland was called as a witness outside the presence of the jury, and refused to answer several questions on advice of counsel, who was present and who so advised him on the record. (Trial Tr., at 863-65). This Court cannot find, contrary to the conclusion of the state court, that it was police intimidation rather than independent advice of counsel which led Mr. Bland to invoke his privilege against self-incrimination. Further, the questions posed to Mr. Bland - whether he provided the name of an alternative suspect to the police, and the name of that suspect - were asked to Detective Weeks, and the jury heard both that Mr. Bland did offer someone else's name, and who that was. Thus, the state court reasonably determined that this is not a case like *Webb*, where the trial judge intimidated the defense's only witness into refusing to testify, and is more like *Emuegbunam*, where that decision was made on the basis of independent advice of counsel. Finally, the Court agrees that because the jury heard the same evidence from

Detective Weeks, any violation of petitioner's rights caused by the way in which the police interrogated Mr. Bland had no effect on the outcome of his trial. Therefore, he is not entitled to relief on this seventh ground.

## H. Ground Eight - Ineffective Assistance of Counsel

Petitioner's eighth ground for relief is directed toward what he contends was constitutionally ineffective assistance on the part of his trial attorney. In the petition, as he did in the state court, he asserts that trial counsel failed to preserve, for purposes of appeal, his sixth and seventh grounds for relief (which the Court has already discussed) and his ninth claim for relief, which relates to certain allegedly improper statements made by the prosecutor during closing argument. In his traverse, he appears to add, for the first time, a claim that counsel did not adequately investigate the allegedly poor police work involved in the investigation and did not call any expert witnesses on that subject. Because the Court can find no reference to that claim in the state court filings, it has been waived for purposes of habeas corpus review.

As to the balance of this claim, this Court has reviewed petitioner's sixth and seventh grounds for relief on their merits, and neither of them justify granting him any relief. Since the claims do not have merit, even if counsel had failed to preserve some portion of them (which the Court does not believe to have occurred), counsel could not have been ineffective because any failure on counsel's part could not have prejudiced petitioner. That leaves only the claim that petitioner's trial counsel was ineffective by not objecting to certain of the prosecutor's comments during closing argument -

primarily comments about the lesser-included offenses involved in the case, including voluntary manslaughter.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland*, 466 U.S. at 697.

The state court acknowledged that counsel's failure to object to these comments waived any appellate review of their appropriateness other than plain error review. However, that court also concluded that the comments were not improper or prejudicial, observing that:

> We find nothing in the prosecutor's rebuttal comments indicates defense counsel wanted the jury to find appellant guilty of voluntary manslaughter. Rather, the prosecutor's rebuttal comments responded to earlier defense arguments in which appellant asked the jury to consider voluntary manslaughter, which takes into account serious provocation by the victim, if the jury found that appellant shot Armstrong.

*State v. Whiteside, supra*, at *18. Thus, the state court concluded that counsel's failure to object to these remarks did not prejudice petitioner because the remarks themselves did not unfairly prejudice him.

Because the state court cited to *Strickland* and correctly understood its two-part test, the question for this Court is whether the state court unreasonably applied *Strickland's* prejudice test to the facts of this case.

As this Court explained in *Sowell v. Collins*, 557 F.Supp.2d 843, 911 (S.D. Ohio 2008),

> When analyzing a claim of prosecutorial misconduct, a federal court must first determine whether the challenged statements were improper. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.2000). If improper, the court must examine whether the statements were so flagrant as to constitute a denial of due process and warrant the granting of a writ. Even if the prosecution's conduct was improper, or even "universally condemned," a federal court can only reverse a conviction or sentence if the statements were so flagrant as to render the entire trial fundamentally unfair. *See e.g., Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006). A court makes that determination by considering the following four factors: (1) the

likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005); *see also Bowling v. Parker*, 344 F.3d 487, 512–13 (6th Cir. 2003). Relief will not be granted unless the conduct of the prosecutor "likely had a bearing on the outcome of the trial...." *Byrd*, 209 F.3d at 530.

Here, the only comments which petitioner alleges were improper were comments that, according to him, suggested to the jury that petitioner's counsel wanted the jury to find petitioner guilty of voluntary manslaughter. But that is not what the prosecutor said. Petitioner's counsel did argue that, should the jury find that petitioner was the shooter, it had to consider if he was guilty of voluntary manslaughter rather than aggravated murder, which is exactly how the jury instructions and verdict forms were drawn up. In response, the prosecutor correctly characterized this argument in this way: "So he's asking you folks to think his client didn't do it, but if he did do it, he did it because he was so mad at the victim." (Trial Tr., at 1186). That is a proper summary of the argument on voluntary manslaughter and does not in any way suggest that defense counsel wanted the jury to find petitioner guilty of any crime. The state court of appeals did not unreasonably apply *Strickland* to counsel's failure to object to this comment because any objection would have been properly overruled; the comment is simply not objectionable. Therefore, there is no merit to plaintiff's eighth ground for relief.

## VII. RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that petitioner's claims be **DISMISSED.**

## VIII. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge