## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JULIUS O. WHITESIDE**,

    **Petitioner,**　　　　　　　　　　**Case No. 2:10-cv-816**

    v.

**WARDEN, SOUTHERN OHIO**　　　　**JUDGE GREGORY L. FROST**
**CORRECTIONAL FACILITY,**　　　　**Magistrate Judge Kemp**

    **Respondent.**

### OPINION AND ORDER

Petitioner, Julius O. Whiteside, a state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 alleging that he is in custody in violation of the Constitution of the United States. The case is before the Court to consider petitioner's objections to a recommendation from the Magistrate Judge that the petition be denied and that this case be dismissed. For the following reasons, the Court will overrule the objections, adopt the Report and Recommendation, and dismiss the case.

### I. Background and Procedural History

Because the background and procedural history of the case does not appear to be disputed, the Court will summarize it only briefly. Petitioner was indicted in Franklin County, Ohio, and charged with killing an individual named Jaron Armstrong. Two jury trials ended without a verdict, although as a result of the second trial, petitioner was convicted by the judge of having a weapon while under a disability. While that conviction was on appeal, petitioner was tried a third time for murder, and was found

guilty of voluntary manslaughter.  He was sentenced to a ten years in prison on that charge plus three years for a firearm specification.  This thirteen-year sentence was run concurrently with the five-year prison term he received for the weapons conviction. Petitioner also appealed the manslaughter conviction, but the Tenth District Court of Appeals affirmed both convictions, and the Ohio Supreme Court denied review.  The only other action which petitioner filed in state court challenging his convictions was a post-conviction petition under Ohio Revised Code §2953.21.  The trial court held that all of the claims in the petition were barred by the doctrine of *res judicata*, and petitioner did not appeal that decision.  He then timely filed this action under 28 U.S.C. §2254, and the Magistrate Judge, after reviewing the petition, the return, the traverse, and various exhibits, recommended dismissal.

## II.  Standard of Review

If a party objects within the allotted time to a report and recommendation, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b) (1); *see also* Fed.R.Civ.P. 72(b). Upon review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III.  The Facts

According to the state court of appeals' opinion, *see State v. Whiteside*, 2009 WL 1099435, *1-2  (Franklin Co. App. April 23, 2009),

2

The charges herein arise out of the shooting death of Jaron Armstrong ("Armstrong"), that occurred on September 15, 2005, at approximately 1:00 a.m. During the trial, the jury heard testimony from 17 witnesses and the following factual scenario is taken from the same.

Early in the day of September 14, 2005, Erika Lewis ("Lewis"), who had ended a relationship with Armstrong, was walking down the street in the area of the Franklin County Courthouse with her friend, Donee Peterson ("Peterson"), and Peterson's son. Appellant called out to Lewis that she would "look cute in some Apple Bottom jeans." (Tr. 509.) Appellant, who was with two other men, introduced himself as "Nut." Appellant and Lewis exchanged "chirp" and cell phone numbers. Peterson and Lewis then proceeded to a job fair at Nationwide Arena and afterwards went to a Wendy's restaurant. Appellant "chirped" Lewis and later gave Lewis and Peterson a ride in his pickup truck to Lewis's apartment at the Nelson Park Apartments at 1964 Maryland Avenue, in Columbus, Ohio.

Appellant returned to Lewis's apartment later that day and took her to a McDonald's restaurant. Appellant left again, but Lewis later "chirped" appellant to see if he could get some marijuana for her. Appellant agreed to, and they met at a house off of Fifth Avenue. After obtaining some marijuana and smoking some at the house off Fifth Avenue, Lewis returned home. Lewis was preparing for bed when appellant "chirped" and asked her if she wanted some company. Lewis allowed appellant to come over, and once inside, appellant told Lewis his cousin and uncle were also outside. Appellant asked Lewis if they could come in as well, and Lewis allowed them into her apartment. Lewis testified that appellant was driving the same truck as he had earlier that day.

Once appellant and the two other men were inside the apartment, Wonquet Reeves ("Reeves"), and Synneatra Lovett ("Lovett"), who were residents of the apartment complex, came over to Lewis's apartment. According to the women, on his lap, appellant had a gun, described as a revolver, that he later placed in his back pocket. While appellant and the three women were in Lewis's kitchen, Armstrong rode by on a bicycle and said something that they were not able to hear. Armstrong rode by again and this time said something to the effect of coming back and shooting up Lewis's apartment. Lewis told appellant to disregard Armstrong's

3

comments, but appellant went into the living room, said something to the other two men, and then all three went outside. Lewis called them back into the apartment, but then the men exited the back door. While the men appeared to be leaving, appellant walked the other way as Armstrong was then approaching.

Appellant and Armstrong talked for a few minutes and though no one appeared to be yelling, appellant kept his hand in his back pocket where the gun was. The two men separated, and Armstrong walked in the direction of his sister's apartment at 1986 Maryland Avenue. Appellant walked toward the truck where his cousin, who had moved the truck out of the parking spot, was sitting in the driver's seat.

Moments later, several gunshots were heard, and the three women ran outside and saw appellant, with a gun in his hand, running out of a "cut between" the buildings from the area where the shots were fired. Lewis told appellant, "you got to be F'd up; I'm calling the police." (Tr. 563.) Lewis called 911 and heard the truck speed off, squealing its tires in the process. Lewis found Armstrong at the door of his sister's apartment, where he eventually died on the porch.

According to Lakeisha Irvin ("Irvin"), Armstrong's sister, she heard several gunshots and, a few moments later, opened her door to find her brother. Peterson, who was on her own porch at the time, heard gunshots and saw appellant's truck speed off quickly.

The police arrived shortly thereafter. Columbus Police Officer Kevin Eckenrode was the first officer to respond to the call dispatched on September 15, 2005, at 1:03 a.m., of shots fired. Columbus Police Officer Kevin Yankovich was the second officer to arrive, and a female at the scene told him that he needed to "talk to Erika." (Tr. 265.) Less than a minute later, Lewis identified herself to Officer Yankovich and went to his cruiser for questioning. Lewis told Officer Yankovich of the house off Fifth Avenue where the marijuana was purchased, and they drove to that location so that Lewis could point out the exact house to the police. Lewis also told Officer Yankovich "Nut" was responsible for the shooting and that she did not know his real name.

After returning to the scene, Lewis talked to homicide detectives that had arrived. Thereafter, Lewis gathered a few belongings and went to stay at another apartment. The next day, Lewis and Reeves identified

4

appellant out of a photo array. An arrest warrant was issued for appellant on September 16, 2005, and he was eventually apprehended in Georgia.

## IV. Petitioner's Claims and His Objections

Petitioner raised twelve claims in his habeas corpus petition. The Report and Recommendation addressed the first eight on their merits but found that claims nine through twelve were barred by the doctrine of procedural default because petitioner did not raise any of these claims in the course of his two direct appeals. Petitioner has not objected to that finding, so the Court need not discuss claims nine through twelve in this Opinion and Order.

In grounds one, three, four and five of the petition, petitioner argued that the third trial was barred by the Double Jeopardy Clause (ground one), that the trial court violated the Ex Post Facto and Due Process Clauses by giving him the maximum sentence for voluntary manslaughter (ground three), and that the trial court violated the Due Process Clause by refusing to allow two witnesses (Ronnie Bland and Erika Bell) to be called so that the jury could see the witnesses invoke their Fifth Amendment rights (grounds four and five). Petitioner's objections do not discuss the merits of the Magistrate Judge's recommendation as to the dismissal of these claims, so, again, the Court need not discuss them in detail. *See, e.g., Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986)("The parties have 'the duty to pinpoint those portions of the magistrate's report that the district court must specially consider.'"), *quoting Nettles v. Wainwright*,

677 F.2d 404, 410 (5th Cir. 1982).  The Court's review will therefore be limited to petitioner's second, sixth, seventh and eighth grounds for relief.   The Court reviews each of these claims under the deferential standard set forth in certain provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") found in 28 U.S.C. §2254. Under the AEDPA, a federal court may not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  *See also Williams v. Taylor*, 529 U.S. 362, 406–07 (2000); *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001).

## A.  Ground Two

Petitioner's second claim for relief reads as follows:

**Ground Two**: Petitioner's conviction for manslaughter was not supported by the sufficiency of the evidence in violation of the U.S. and Ohio due process clause and was also against the manifest weight of the evidence.

As the Report and Recommendation notes, this is a difficult claim to prevail on in a habeas corpus proceeding because "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)]; second, deference should be given to the [state] Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by the AEDPA."

6

*Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  So, as happened here, if the jury found that there was enough evidence to convict petitioner, and the state court of appeals rejected his challenge to the sufficiency of the evidence, this Court must be deferential to both findings, and may not reweigh the evidence or make credibility determinations that differ from those of the jury.

In his objections, petitioner argues (as he did in the petition) that because no witness testified directly that he or she saw the actual shooting, all of the evidence in this case about whether he was the shooter was purely circumstantial.  He then attempts to cast doubt on the credibility of the witnesses who provided that circumstantial evidence, arguing that they were lying about the things they claimed to have seen.  He bases almost all of his argument on discrepancies between their testimony at either the first or second trials and what they testified to at the third trial.

This type of argument - which concedes that the testimony at trial, if believed, would support a conviction, but which attacks the credibility of that testimony - is completely foreclosed by binding authority.  The Court of Appeals has repeatedly held both that "[c]ircumstantial evidence alone is adequate to uphold a conviction" and that "[t]he credibility of witnesses is exclusively the province of the jury**."**  *See, e.g., United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994).   Even when reviewing the verdict of a federal jury, a process which involves only a single level of deference, trial and appellate judges are prohibited from second-guessing the jury's decision to believe a witness' testimony, even if the witness had been "frequently impeached, questioned,

and sometimes contradicted." *United States v. Adamo*, 742 F.2d 927, 934 (6th Cir. 1984). That Court noted that even if some of the government witnesses provided doubtful testimony, as long as "the jury had been properly instructed as to its role in assessing witness credibility, the jury verdict must stand." *Id*. at 935. Even a verdict supported by the testimony of witnesses who admitted to committing perjury before a federal grand jury, and where one of those witnesses had actually pleaded guilty to doing so, has been upheld on appeal based on the ironclad rule that "credibility determinations are for the jury ...." *See United States v. Yarbrough*, 23 F.3d 409 (6th Cir. May 9, 1994)(unreported).

The facts of this case are far less compelling. Even if there were significant discrepancies between the testimony of the key witnesses at the third trial and what they said at either the first or second trials, it was the job of defense counsel to highlight those differences for the jury, and the job of the jury to decide if those discrepancies made the witnesses' testimony unworthy of belief. The Court has little or no role to play in that process once the jury has rendered its verdict and has chosen to believe what the witnesses had to say. Further, the Court agrees with the Report and Recommendation that the state court of appeals' determination that the testimony which was given by the various witnesses, including witnesses Lewis, Reeves, and Lovett - if that testimony was believed by the jury - was enough to establish petitioner's guilt beyond a reasonable doubt. That testimony is set forth in detail in the state court opinion, *see State v.* Whiteside, 2009 WL 1099435, *8-10, and it established that petitioner

8

had a gun with him when he was in Lewis' apartment, that petitioner left the apartment after the victim rode by on his bicycle shouting threats to the occupants, that petitioner and the victim had a confrontation seconds before the shots were fired, that petitioner then ran from the scene of the shooting while holding a gun in his hand, that he and his companions then fled in petitioner's truck, and that petitioner left the Columbus area and was arrested in Georgia. Consequently, petitioner's second claim, and his objections to the Magistrate Judge's disposition of that claim, are without merit.

### B. Ground Six

Petitioner's sixth claim for relief reads as follows:

**Ground Six**: The trial court erred by not allowing the introduction of Ronnie Bland's interview or at least by not permitting trial counsel to question the police about the substance of their interview with Ronnie Bland in violation of the hearsay exception contained in the Ohio rules of evidence and the U.S. and Ohio constitutional protections of due process of law, fundamental fairness, compulsory process, confrontation, equal protection, and the right to present a complete defense.

This claim was interpreted by the Magistrate Judge as a Due Process Claim based on the trial judge's alleged denial of petitioner's right to present a complete defense to the charges against him. The state court of appeals rejected this claim because , it its view, the key information from the police interview of Mr. Bland was the fact that he had suggested to police that another person, Calvin Parker, might have been the shooter, and defense counsel was allowed to ask the detective who interviewed Mr. Bland about that fact. Thus, although the interview itself was not admitted, the jury did learn that Mr. Bland had told

police that Calvin Parker (who died before the third trial took place) might have shot Mr. Armstrong.

In his objections, petitioner argues that the cornerstone of his defense was that Mr. Parker was the shooter, and that he wished to call Mr. Bland to say so. However, Mr. Bland refused to testify, claiming the Fifth Amendment privilege. Petitioner asserts that this occurred because the police had threatened Mr. Bland with dire consequences if he testified that someone else had been the shooter, and he declined to testify as a result of these threats. However, when petitioner's counsel attempted to introduce the tape or transcript of the police interview where the threats were supposedly made, the trial judge would not allow it. He appears to claim that having the jury learn that Mr. Bland identified an alternative suspect was not enough, and that the jury also should have been able to learn how the police threatened Mr. Bland in order to prevent him from testifying.

As the Report and Recommendation notes, the state court of appeals did not directly address this argument. It concluded that "[i]n the third trial ... appellant did not seek to introduce Bland's police interview...." *State v. Whiteside*, 2009 WL 1099435, *15. If this is so, petitioner cannot argue here that the trial judge committed constitutional error by refusing to admit it.

This Court has conducted an independent review of the trial transcript and agrees with the state court of appeals that trial counsel did not ask the trial

10

judge to admit the interview.  Defense counsel introduced the subject by stating that there was a taped police interview and a transcript of that interview, but rather than asking that the tape or transcript be admitted, counsel informed the trial judge that "it would be our request to put Mr. Bland on the stand, to have him testify to those facts as he knew then as to what he saw and the fact that Julius Whiteside did not commit this homicide."  (Trial transcript, Vol. V, at 858-59).  Mr. Bland's counsel then advised the judge that Mr. Bland would exercise his Fifth Amendment rights, and the trial judge stated that "I'm not going to have Mr. Bland testify or take the Fifth in front of the jury."  (*Id*. at 860).  Counsel, after being so advised, said this: "If I could, Judge, I would eventually, when it's time for my case in chief, like to proffer the tape, not the tape, the transcript of the tape, well, actually probably the tape and transcript to be marked and made a part of the record.  *I realize it won't be going to the jury since he's not going to be testifying*." *Id*. at 861 (emphasis added).  The ensuing discussion centered around defense counsel's stated intention to question the interviewing detective, Detective Weeks, about whether any investigation of other possible suspects was done after Mr. Bland was interviewed, and the trial judge said that he did not "see a problem with that."  *Id*. at 862.  Counsel did question Detective Weeks about that, and, over objection, the detective was permitted to tell the jury that he investigated Calvin Parker as a suspect.  When it was time for petitioner's counsel to present his case in chief, he called no witnesses, and moved only for

11

the admission of two exhibits he had shown to Detective Weeks on cross-examination - a news story about how Calvin Parker was killed, and his obituary.  Those documents were both admitted; the tape or transcript of the interview was  not proffered as an exhibit for the jury.  (*Id*. at 1081-82).  At the third trial, trial counsel never articulated the theory which appears in petitioner's objections, namely that it was not so much the fact that there was another suspect which was important, but that it was the police's threats to Mr. Bland that the jury needed to know about.

The record does reflect that, during the second trial, petitioner's counsel (who did not represent him at the third trial) made this argument in a written trial memorandum and attached a copy of the transcript to that memorandum. *See Return of Writ*, Doc. 5, Exh. 3.  But, as the court of appeals observed, "error relating to the first and second trials are [sic] moot ...."  *State v. Whiteside, supra,* at *15.  Thus, the only portion of this claim which was preserved for review relates to the identification of Mr. Parker as an alternative suspect.  Because the jury heard that information, there is really no issue here to review.  Had petitioner's counsel wanted the jury to know that Mr. Bland was threatened, he could have asked Detective Weeks, or he could have attempted to introduce the tape or transcript of the interview, but he did neither.  Thus, the question of whether the trial court erred in excluding an interview transcript allegedly showing that the police used unfair tactics in order to prevent Mr. Bland from testifying is not

before the Court, and that claim cannot form the basis for habeas corpus relief.

## C. Ground Seven

Petitioner's seventh claim for relief reads as follows:

**Ground Seven**: Prosecutorial and police misconduct in the form of the witness intimidation of Ronnie Bland, a defense witness, violated the Petitioner's right to a fair trial, compulsory process, substantive due process and equal protection under the U.S. and Ohio Constitutions.

This claim, which is similar to claim six, does not focus so much on the alleged exclusion of the transcript of Detective Weeks' interview of Ronnie Bland, but on the substance of what occurred during the interview. Of course, this claim shares some of the same deficiencies as the previous claim, because the tape or transcript of the interview which supposedly proves that the police intimidated or threatened Mr. Bland was not made a part of the record at the third trial. The state court of appeals also made a factual finding on this issue, to which this Court must defer, that it was "clear from the record Bland's counsel advised Bland to assert his Fifth Amendment rights if asked questions pertaining to the same" and that "we do not find we are presented with evidence of witness intimidation ...." *State v. Whiteside, supra,* at 16.

In his objections, petitioner claims that the record does contain evidence of witness intimidation. However, he cites only to Detective Fulton's testimony at the second trial, and to the transcript of the Bland interview which was attached as an exhibit to the trial memorandum filed in connection with the second trial. Since neither of these pieces of evidence were part of the record of the third trial, the court of appeals

13

correctly determined that it had no evidence before it of witness intimidation.  Its

factual finding on that point, and its corresponding finding that Mr. Bland refused to

testify not because of police intimidation, but because his counsel advised him to

exercise his Fifth Amendment rights, are not "an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §

2254(d)(2).  This Court is powerless to overturn those findings, and therefore has no

basis on which to grant petitioner any relief on his seventh claim.

### D.  Ground Eight

Petitioner's eighth claim for relief reads as follows:

> **Ground Eight**: Trial counsel rendered ineffective assistance of counsel in
> violation of the Sixth Amendment to the U.S. Constitution and Article I,
> Sections 10 and 16 of the Ohio Constitution.

The Report and Recommendation discussed three instances of alleged ineffective

assistance of trial counsel: counsel's failure to preserve for appeal petitioner's sixth,

seventh, and ninth grounds for habeas corpus relief.  The sixth and seventh claims for

relief are discussed above; the ninth claim relates to counsel's failure to object to certain

allegedly improper statements made by the prosecutor during closing argument.

It is the case that, by failing to offer the tape or transcript of the Bland interview

into evidence or to question the detectives about what they may have said to Mr. Bland

during that interview, counsel did not fully preserve some constitutional claims for

appeal.  The state court of appeals apparently recognized this both in its discussion of

what were, on appeal, petitioner's seventh and eighth assignments of error, and in its

14

discussion of this claim, which was his ninth assignment of error.  However, after citing

to the appropriate standard for evaluating this type of claim as expressed in *Strickland v.*

*Washington*, 466 U.S. 668, 686 (1984), the court of appeals held that any error on

counsel's part was not prejudicial.  Specifically, the court stated that

> even if the entire interview was allowed into evidence, the jury still had
> before it the testimony of three witnesses that saw appellant, with a gun in
> his hand, running from the area where shots were fired and then speeding
> from the scene in a truck. Therefore, we are unable to find a reasonable
> probability that the result of the proceedings would have been different if
> counsel had been successful in convincing the trial court to admit the
> entire interview.

*State v. Whiteside, supra,* at 17.  The court of appeals phrased its inquiry properly under

the second prong of the *Strickland* test, which requires the Court to consider whether

"but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Strickland*, 486 U.S. at 694.  Under the AEDPA, this Court must give the

proper measure of deference to the state court's determination of this issue, and can

reach a different conclusion only if the state court unreasonably applied the *Strickland*

standard to the facts of this case. *See Eley v. Bagley*, 604 F.3d 958 (6th Cir. May 14, 2010).

The Court of Appeals conceptualized this issue as involving counsel's failure to

get certain information before the jury.  Had counsel been successful in doing so, here is

what the jury would have learned in addition to what it already knew.  The jury did

learn that Calvin Parker was put forth as a suspect.  If the entire transcript of Ronnie

Bland's interview had been admitted, the jury would also have found out (assuming

that no hearsay objection was lodged) that, according to Mr. Bland, after Mr. Armstrong

made his threats (which, according to Mr. Bland, happened inside Ms. Lewis'
apartment), Mr. Bland, Calvin, and petitioner believed that Mr. Armstrong had gone to
get a gun.  They followed him outside, and Calvin started shooting at him.  After Mr.
Bland said that Calvin had the gun the entire time, the detectives expressed some
disbelief, based on the fact that all of the other witnesses had said that petitioner was
the one with a gun.  They told him, "All you're going to end up doing is get yourself
charged with murder.  So keep running your mouth.  Keep telling us this story.
Because I want to be able to take this right to the grand jury." (*Return*, Exh. 3).  Later,
after Mr. Bland provided additional details inconsistent with the statements of all of the
other witnesses (and Mr. Bland did not come forward with his statement until shortly
before the third trial, and after he had been arrested on unrelated charges), the
detectives told him that they would "do everything [we] can to talk this man into filing
a charge on you out of this murder .... You basically confessed to be an accessory to
felony murder." *Id*.  They then told him that "all you're going to do is put that noose
around your neck, too" if he persisted in telling them that story and that if he "got
nothing to do the next 18 years, that's your call." *Id*.  According to the state court
opinion, even armed with all this additional knowledge, the jury would still likely have
returned a guilty verdict.

  That analysis does not precisely address the issue posed by petitioner's
ineffective assistance of counsel claim, however.  His claim assumes that the trial judge,
as he had done before, would not have admitted the tape or transcript, but would have

excluded it on hearsay grounds. Petitioner faults counsel for not forcing that ruling by offering the tape or transcript into evidence, and without an adverse ruling, there was nothing to appeal. Petitioner also argues that his trial counsel should have proffered the tape as evidence of police misconduct, which would have been an issue not so much for the jury to determine, but for the trial judge to rule on. Again, without the tape or transcript, as the court of appeals noted, the evidence simply did not support the claim of police misconduct; the tape was the only place where that evidence appeared, and it was not part of the record for purposes of appeal because it was never made a part of the record in the third trial. Thus, what petitioner actually argues is not so much that the jury's verdict would have been different, but, presumably, that the outcome of the appeal would have been different if counsel had preserved these issues for appeal.

Had petitioner's sixth claim been preserved for appeal, the state court of appeals would have been presented directly with the question of whether the exclusion of the Bland interview as evidence for the jury would have been improper. Clearly, Mr. Bland's statements in that interview to the effect that he saw Calvin Parker fire the fatal shots were hearsay. There is no reasonable likelihood that the court of appeals would have found the exclusion of that portion of the interview to be reversible error. The rest of the interview (mainly the detective's statements to Mr. Bland) do not tend to prove or disprove anything about petitioner's guilt or innocence; they merely reflect the detective's efforts either to get Mr. Bland to tell the truth (the most charitable construction of their comments) or their efforts to prevent him from testifying that he

17

saw Calvin Parker shoot Mr. Armstrong, a statement inconsistent with the State's theory that petitioner was the shooter (which is what petitioner asserts their motivation was). Even if the jury learned that the detectives leaned on Mr. Bland hard in order to stop him from testifying, that fact would not be of particular significance to their determination of guilt or innocence, and the court of appeals concluded that the jury's lack of knowledge of this fact was harmless. That determination may be debatable, but it is not unreasonable, especially in light of the testimony at the third trial by multiple witnesses who saw petitioner with the gun both before and after the shooting.

The other question posed by counsel's failure to proffer the interview tape or transcript is whether, had that evidence been before the trial judge, it is likely that he would have ruled that petitioner's Due Process rights were violated, and perhaps granted immunity to Mr. Bland so that he could have testified free of the fear of prosecution; or, if he did no so rule, that it is likely that the state court of appeals would have reversed on that issue. The state court of appeals did not directly address this argument, but it did determine that counsel's failure to preserve any issues about the transcript or tape was not prejudicial under *Strickland*, so the Court must still decide if that is an unreasonable application of the prejudice prong of the test. Here, in order to obtain reversal on appeal, petitioner would have had to persuade the appellate court that the trial court, had it been asked, should have granted some remedy to petitioner based on the contents of the tape. It does not seem likely to this Court that either state court would have done so. Although it is the case that government agents do not have

free reign to intimidate a defense witness, if the jury would have found the testimony of that witness incredible, the defendant cannot demonstrate the type of harm which would entitle him to relief.  So, for example, in *Clemons v. Luebbers*, 381 F.3d 744 (8th Cir. 2004), the Court of Appeals rejected a similar claim based on alleged intimidation of a defense witness because the district court had found that the witness, even had he testified, would not have been believed by the jury.  When that is so, and the outcome of the trial would not have been different even had the witness testified, any error in not permitting the witness to testify is harmless from a constitutional point of view.

Here, the entirety of Mr. Bland's interview persuades the Court that, even if that evidence had been before the state courts, they would not have granted petitioner any type of relief which would have undone the effects of whatever intimidation occurred and which would have permitted Mr. Bland to testify.  Mr. Bland's statements to Detectives Weeks and Fulton was full of contradictions.  He said that petitioner had met Ms. Lewis at a strip club several days before the incident, rather than at the courthouse earlier on that day.  He then recanted that portion of his statement after being told that it was wrong.  He could not really explain why, during the first and second trials, he never came forward with any evidence which would have helped petitioner, and chose to do so only after Mr. Parker had died.  His account of the events of the night in question was completely at odds with the account given by every other witness.  He said Mr. Armstrong actually came into Ms. Lewis' apartment; he said Mr. Armstrong arrived and left on foot; he said that Mr. Parker had the gun in his pocket the entire

evening; and he placed Mr. Parker on the driver's side of the truck when he fired the shots, with himself and petitioner on the passenger side, although somehow when they fled, their positions were reversed.  It is extremely unlikely that the jury would have given significant weight to anything he had to say, so even if some measure of improper intimidation occurred, the outcome of petitioner's case would not reasonably have been different.  *See also Williams v. United States*, 294 Fed. Appx. 460, 463 (11th Cir. Sept. 19, 2008)(holding that if the "testimony [of the witness allegedly intimidated] would [not] have led to different result at [the] trial," even if counsel performed deficiently in failing to bring the intimidation to the trial judge's attention, the defendant could not demonstrate prejudice under the second prong of the *Strickland* test).  Such is the case here.

The only remaining portion of the ineffective assistance of counsel claim relates to  trial counsel's failure to object to certain comments made by the prosecuting attorney during closing argument.  In particular, petitioner claims that the prosecutor improperly suggested to the jury that petitioner's counsel wanted the jury to find petitioner guilty of voluntary manslaughter.  The Report and Recommendation observed, however, that this

> is not what the prosecutor said.  Petitioner's counsel did argue that, should the jury find that petitioner was the shooter, it had to consider if he was guilty of voluntary manslaughter rather than aggravated murder, which is exactly how the jury instructions and verdict forms were drawn up.  In response, the prosecutor correctly characterized this argument in this way: "So he's asking you folks to think his client didn't do it, but if he did do it, he did it because he was so mad at the victim." (Trial Tr., at

> 1186).  That is a proper summary of the argument on voluntary
> manslaughter and does not in any way suggest that defense counsel
> wanted the jury to find petitioner guilty of any crime.  The state court of
> appeals did not unreasonably apply *Strickland* to counsel's failure to object
> to this comment because any objection would have been properly
> overruled; the comment is simply not objectionable.

Report and Recommendation, Doc. 10, at 50.  This Court agrees.  Therefore, there is no

merit to any portion of petitioner's eighth ground for relief or his objections to the

Magistrate Judge's recommended denial of relief on that claim.

### V.  Order

For all of these reasons, petitioner's objections (Doc. 18) to the Report and

Recommendation (Doc. 10) are **OVERRULED** and the Report and Recommendation is

**ADOPTED AND AFFIRMED.**  The petition for habeas corpus is **DENIED** and this case

is **DISMISSED.**

**IT IS SO ORDERED.**


  /s/   Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**

21